UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CESAR VARGAS DIAZ,<br><br>Defendant. | No. 1:16-cr-00070-DAD-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. Nos. 76, 84) |

Pending before the court is a motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), brought on behalf of defendant Cesar Vargas Diaz. (Doc. Nos. 76, 84.) That motion is based in part on the purported risks posed to defendant Diaz by the ongoing coronavirus ("COVID-19") pandemic. For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On December 4, 2017, defendant was sentenced to a term of 152 months in the custody of the U.S. Bureau of Prisons ("BOP"), followed by a 60-month term of supervised release, after pleading guilting to conspiracy to distribute and possession with intent to distribute over 50 grams or more of actual methamphetamine or 500 grams or more a mixture or substance containing methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1). (Doc. Nos. 44, 57.) Defendant Diaz is currently incarcerated at the Federal Correctional Institution, Lompoc ("FCI Lompoc"). (Doc. No. 84 at 1.) His projected release date is June 20, 2027. (Doc. No. 86 at 3.)

On August 11, 2020, defendant filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. No. 74.) On August 18, 2020, after notifying the court that his initial filing "inadvertently contain[ed] sensitive information," defendant filed an amended motion for compassionate release. (Doc. Nos. 83, 84.) On August 25, 2020, the government filed its opposition to the motion, and on September 1, 2020, defendant filed his reply thereto. (Doc. Nos. 86, 87.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 3:13-cr-00444-BR, 2020 WL 1673440, at *2 (D. Or. April 6, 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[1] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

---

[1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

2

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[3]; *see also*

---

[2] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[3] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

*United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar. 31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, a large and growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c). *See, e.g.*, *United States v. Parker*, 2:98-cr-00749-CAS, 2020 WL 2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district courts to have done so agree that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

**ANALYSIS**

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-cr-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 2020 WL 2572525, at *4; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

## I.  Administrative Exhaustion

Defendant Diaz requested his compassionate release from the Warden at FCI Lompoc on June 11, 2020, and at the time he filed his pending motion had not received a response to that request.  (Doc. Nos. 84 at 4.)  The government does not dispute that defendant Diaz has exhausted his administrative remedies.  (Doc. No. 86 at 3.)  Accordingly, the court will turn to the merits of defendant's motion.

## II.  Extraordinary and Compelling Reasons

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions for reductions in their sentence under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."  *Id*.  In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

5

> The defendant is
>
> > (I) suffering from a serious physical or medical condition,
> >
> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the particular circumstances of a case are considered in their totality. *See, e.g.*, *Parker*, 2020 WL 2572525, at *9–10 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[4]

Defendant Diaz argues that he "suffers from a pre-existing blood clotting condition, which leaves him at the highest risk of suffering severe illness and/or dying from COVID-19." (Doc.

---

[4] Here, however, because defendant Diaz is only 37 years old (Doc No. 50 at 2), his age and age related factors do not play a role in consideration of his pending motion.

6

1  No. 84 at 1.) Although defendant tested positive for COVID-19 and, as a result of his illness, was
2  placed on a ventilator for 20 days in April 2020, he has very fortunately since recovered. (*Id.* at
3  7, 9.) Defendant argues that "[h]is bout with COVID-19 has exacerbated [his blood clotting]
4  condition in that he now suffers constant pain and paralysis in his left arm due to a blood clot that
5  appeared after his infection." (*Id.* at 7.) Defendant Diaz's BOP medical records confirm that he
6  tested positive for COVID-19 in April 2020, suffered a "severe case" of the virus, and thereafter
7  experienced shoulder pain in his left arm. (Doc. Nos. 77, 78.) Defendant also points the court to
8  three studies which purportedly support his argument that "severe blood clotting [] can affect the
9  lungs and cause deep vein thrombosis." (Doc. No. 84 at 8.) Accordingly, defendant contends
10 that he is "clearly categorized as someone who is at serious risk of death if he is reinfected," and
11 the court should therefore "find him eligible for compassionate release." (*Id.* at 9.)

12     In its opposition, the government concedes both that defendant has a history of suffering
13 from blood clots, dating as far back as 2008, and that he contracted COVID-19 in April 2020 and
14 recovered. (Doc. No. 86 at 3.) The government also concedes that "Diaz did develop a blood
15 clot in his [left][5] arm while being treated for COVID-19." (*Id.*) However, the government argues
16 that the blood clot and defendant Diaz's history of blood clotting is not a "[Centers for Disease
17 Control and Prevention ("CDC")] identified high-risk factor" for suffering severe illness from
18 COVID-19, and that his blood clot "is being monitored and treated with blood thinners and
19 testing." (*Id.* at 3–4.) Accordingly, the government contends that defendant's current medical
20 condition is not sufficiently serious or substantial to diminish his ability to provide self-care in a
21 correctional facility. (*Id.* at 9.) In addition, the government argues that defendant's fear that he
22 may not survive a reinfection of COVID-19, "is a speculative argument in light of the uncertainty
23 surrounding the virus, and the BOP's demonstrated ability to care for defendant while infected."
24 (*Id.* at 11.)

---

[5] In its opposition the government states that the blood clot developed in defendant's right arm. (*See* Doc. No. 86 at 3.) The court notes that the first page of the relevant BOP medical records do states "Right Arm" under "location," but this appears to be in error, given that a closer review of the records reveals that the clot developed in in defendant's left arm. (*See generally* Doc. No. 78.)

7

In reply, defendant Diaz notes that since filing the pending motion, he "has been transferred to the chronic care clinic." (Doc. No. 87 at 2.) He notes that while his "symptoms [related to the blood clot] have lessened, [] his levels of D-dimer, a chemical which drives clotting, are still elevated." (*Id.*) Defendant concedes that blood clots are "not explicitly recognized by the CDC" as a risk factor for suffering death or serious illness from COVID-19 if one contracts the virus, but argues that his assertion that he is at high risk from COVID-19 as a result of his condition is based on "[s]cientific, peer reviewed articles." (*Id.*)

As an initial matter, defendant contends that those who have contracted and recovered from COVID-19, such as himself, can be re-infected with the virus. (Doc. No. 84 at 10.) The government acknowledges in its opposition that although defendant Garcia may no longer be at risk of reinfection in light of his recovery, "the science is still developing on this particular coronavirus." (Doc. No. 86 at 10–11.) The government's concession, of sorts, is well-taken in that it has been recognized by courts that "the science is unclear on whether reinfection [of COVID-19] is possible." *States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020); *see also United States v. Hanson*, No. 6:13-cr-00378-AA-1, 2020 WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently acknowledged. . . . [T]he Court remains concerned about FCI Terminal Island's ability to provide adequate care in light of defendant's complex medical needs. The Court is not convinced that FCI Terminal Island has been successfully mitigating the risk of infection, given the high numbers of infected inmates and defendant's own contraction of the virus."). Other courts have taken the position that the uncertainty surrounding the danger of re-infection with COVID-19 "cuts against compassionate release," in part because it is the defendant's burden to establish that "extraordinary and compelling" reasons for compassionate release exist. *See United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020). Erring on the side of caution, the court finds defendant's fear of reinfection, and the potential consequences to him were that to occur, to be potentially well-placed. Nevertheless, as explained below, the

/////

1 court does not find compelling or extraordinary reasons warranting a reduction in defendant's
2 sentence.
3       It is undisputed that the CDC does not recognize individuals with blood clots or a history
4 of blood clotting as having an increased risk of suffering severe illness from COVID-19. *See*
5 *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention,
6 https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
7 (last visited September 8, 2020). However, even if individuals with blood clots are at a higher
8 risk of suffering severe illness from COVID-19, defendant Diaz has not shown or even argued
9 that FCI Lompoc is unable to monitor his condition and provide adequate medical care for him.
10 In fact, the medical records he has provided the court in support of the pending motion suggest
11 that FCI Lompoc is providing him that monitoring and care. Since testing positive for COVID-19
12 in April and, fortunately, recovering and after developing the blood clot in his left arm, defendant
13 Diaz has received medical treatment and his left arm appears to be improving. (*See, e.g.*, Doc.
14 No. 78 at 6 (noting that with respect to defendant Diaz' left arm, he reported "an improvement,"
15 his "[p]ain improved," and that his "LUE [left upper extremity] [was] improving"); *see also* Doc.
16 No. 91.) In his reply in support of the pending motion, defendant reports that "[h]e is to be
17 assessed for increased D-dimer levels and sent for radiology within the month." (Doc. No. 87 at
18 2.) Based on the foregoing, the court finds that the evidence establishes that medical staff at FCI
19 Lompoc is able to monitor and care for defendant Diaz. *See United States v. McCollough*, No.
20 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D. Ariz. May 29, 2020) ("Since
21 Defendant has contracted COVID-19, the relevant questions concern (1) the course of his illness,
22 (2) the state of his health, (3) his prognosis, and (4) the adequacy of the care and treatment being
23 provided to him in BOP given his pre-existing conditions. . .. There is no evidence that the
24 circumstances surrounding Defendant's health or treatment are extraordinary or compelling.");
25 *see also United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *3 (E.D.
26 Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a sufficient basis
27 for compassionate release.") (internal quotation marks and citation omitted).
28 /////

Moreover, defendant Diaz has not persuasively argued that he is unable to provide self-care at FCI Lompoc—whether that means self-care in light of his blood clot condition or his ability to social distance and avoid contracting COVID-19 again. *See United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020) ("[T]he presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care means" and thus the inability of individuals at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing is an inability to provide self–care) (citation omitted).  In the pending motion, defendant asserts in conclusory fashion that FCI Lompoc is "among the worst coronavirus hotspots in the nation," relying on a declaration filed in May 2020 in support of a class action lawsuit pending in the Central District of California in the case of *Torres v. Milusnic*, No. 20-cv-04450-CBM-PVC, brought on behalf of inmates challenging the conditions of confinement at that prison. (Doc. Nos. 84 at 6–7; 84-3.)  The court certainly recognizes that FCI Lompoc initially failed to control the outbreak of COVID-19, since the majority of its inmates tested positive for the virus. *See United States v. Connell*, No. 18-cr-00281-RS, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020).  That situation is obviously an extremely serious one.  However, as defendant Diaz concedes, the infection rate at FCI Lompoc has since "dropped considerably" (Doc. No. 84 at 6), and it appears that the prison medical staff at that prison was able to, and continues to, adequately monitor defendant's condition and care for him.  In its opposition, the government argues that "BOP has taken steps to try and protect inmates' . . . health," including checking temperatures at least once a day, providing inmates with cloth masks to wear on a daily basis, providing inmates with cleaning supplies, and sanitizing common areas multiple times a day. (Doc. No. 86 at 4.)  In his reply, defendant does not argue that he lacks access to protective gear and cleaning and sanitizing supplies, or that he is unable to

/////
/////
/////
/////
/////

socially distance, or that he is otherwise unable to provide for his own self-care at FCI Lompoc.[6]

Accordingly, the court concludes that defendant Diaz has not met his burden of demonstrating extraordinary and compelling reasons for his compassionate release under § 3582(c)(1)(A). Therefore, his motion will be denied.

### III.     Consistency With the § 3553(a) Factors

Finally, even if defendant Diaz's motion were supported by a showing of extraordinary and compelling reasons for his compassionate release, the undersigned is not persuaded that the requested reduction in sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).[7] *See Parker*, 2020 WL 2572525, at *11.

---

[6] While defendant Diaz does not describe the specific current conditions at FCI Lompoc, the court recognizes that another judge of this court has observed as follows:

> [a] recent Inspector General's report on the situation at the facility states, "despite FCC Lompoc's efforts, its infrastructure may have limited its ability to implement the CDC's social distancing guidelines. FCC Lompoc has open bar cells (as opposed to solid doors), and inmates congregate in common areas, which can facilitate rapid community spread." Department of Justice Office of the Inspector General, *Pandemic Response Report July 2020, Remote Inspection of Federal Correctional Complex Lompoc*, Report 20-086 (July 23, 2020) (accessed Sept. 2, 2020). The Inspector General's report states "unless the BOP promptly takes longer-term actions to address [staffing shortfalls], Lompoc will again face a shortage of medical and correctional staff when [temporary duty] staff return to their home institutions." *Id.* at 2–3.

*United States v. Schweder*, No. 2:11-cr-00449-KJM, 2020 WL 5257598, at *5 (E.D. Cal. Sept. 3, 2020) (motion for compassionate release denied without prejudice). As noted above, however, in this case there are no competing accounts of current conditions at FCI Lompoc.

[7] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

Defendant argues that his extensive criminal history is "a byproduct of a life of trauma and addiction," and that he "has made excellent use of the institutional resources at the BOP." (Doc. No. 84 at 2.)  In this regard, he notes that he has received various certificates of achievement, including for completing the "DAD" program, where he reaffirmed his commitment to his children, and for completing various courses for drug abuse, alternatives to violence, reentry, and wellness.  (*Id.* at 5–6, Ex. C-2.)  Defendant contends that he has "served a sufficient portion of his sentence in custody to satisfy the punitive purposes of sentencing . . .."  (*Id.* at 11.)

The government counters that defendant's significant criminal history demonstrates that he does not respect the laws of society.  (Doc. No. 86 at 12.)  For example, the government notes that, on April 10, 2019, during a random search of defendant's cell at FCI Lompoc, a greeting card "with hearts that had a different texture and appeared to be altered was found" in an envelope addressed to defendant.  (*Id.* at 13.)  The greeting card was seized and tested positive for amphetamines, and defendant thereafter received prison disciplinary sanctions for possession of narcotics.[8]  (*Id.*)  The government also contends that consideration of the 3553(a) factors does not warrant a sentence reduction in defendant's case because the court already imposed a sentence at the low-end of the advisory sentencing guideline range and because granting the pending motion would "result[] in an effective sentence of just 52-months – far below the applicable Guidelines range and with no significant facts supporting such a drastic, unwarranted sentence reduction."  (*Id.* at 13–14.)

As noted above, defendant is currently serving a 152-month sentence for conspiracy to distribute and possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1) after pleading guilty in July 2017.  (Doc. Nos. 44, 57.)  The offense of conviction was a serious one:  defendant and his co-conspirators obtained large amounts of methamphetamine from Mexico and smuggled the drugs into the United States for distribution. With his acceptance of responsibility acknowledged, the presentence report in his case determined that his total offense level was 31, that his criminal history category was VI, and his

---

[8] In his reply, defendant Diaz does not dispute that he had narcotics in his prison cell.

1  advisory sentencing guideline range therefore called for a term of imprisonment of between 188
2  and 235 months.  (Doc. No. 50 at 4, 6.)[9]  After giving due consideration to the § 3553(a)
3  sentencing factors, the undersigned varied downward from the guideline range and sentenced
4  defendant to a 152-month term of imprisonment.  (Doc. No. 57.)

5  As of the date of this order, and based upon application of his good conduct time as
6  calculated by the government (Doc. No. 86 at 3), defendant Diaz has served only approximately
7  52 months of his 152-month term of imprisonment, or 34% of the sentence imposed.  *See United*
8  *States v. Lonich*, No. 1:14-cr-00139-SI-1, 2020 WL 26148743, at *3 (N.D. Cal. May 21, 2020)
9  (denying motions for compassionate release, noting, "the Court finds it significant that defendants
10  have served far less than half of their sentences"); *United States v. Shayota*, No. 1:15-cr-00264-
11  LHK-1, 2020 WL 2733993 at *6 (N.D. Cal. May 26, 2020) ("'The length of the sentence
12  remaining is an additional factor to consider in any compassionate release analysis,' with a longer
13  remaining sentence weighing against granting any such motion.") (quoting *Connell*, 2020 WL
14  2315858, at *6).  Moreover, the 152-month sentence was already well below the low end of the
15  advisory sentencing guideline range.  Granting defendant Garcia's compassionate release motion
16  would reduce his sentence to a 52-month term, which would be well below the minimum
17  mandatory sentence and would be a dramatic variance down from the advisory sentencing
18  guidelines range in his case.  The defendant's criminal history  (Doc. No. 50 at 7–17) is extensive,
19  spanning over two decades and exemplifies a disregard for the safety of others and respect for the
20  law.  Based on this long and troubling criminal history, coupled with the facts that (1) the court
21  already sentenced defendant to a term of imprisonment that was below the low end of the
22  advisory sentencing guidelines range and (2) defendant just last year possessed narcotics in his
23  prison cell, the court does not find that defendant has established his rehabilitation[10] or that
24  /////

---

[9]  Given the amount of methamphetamine involved in defendant Garcia's offense of conviction, the charge carried with it a ten year minimum mandatory sentence.

[10]  Even if defendant Diaz had demonstrated his full rehabilitation since sentencing, rehabilitation alone is not enough to warrant compassionate release.  *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.

granting compassionate release would promote respect for the law, provide just punishment, afford adequate deterrence, or protect the public from further crimes by defendant.[11]

### CONCLUSION

Because defendant Diaz has failed to demonstrate that "extraordinary and compelling" reasons exist justifying his release under 18 U.S.C. § 3582(c)(1)(A) or that the requested reduction in his sentence of imprisonment would be consistent with consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), his motion for compassionate release (Doc. Nos. 76, 84) is denied.

IT IS SO ORDERED.

Dated:   **September 27, 2020**

UNITED STATES DISTRICT JUDGE

---

[11] In the pending motion, defendant Diaz also appears to request that the court to release him on home confinement. (*See* Doc. No. 84 at 2–3, 12.) However, the CARES Act "'authorizes the BOP—not courts—to expand the use of home confinement' under 18 U.S.C. § 3624(c)(2)." *United States v. Fantz*, No. 5:14-cr-32-BR, 2020 WL 3492028, at *1 (E.D.N.C. June 26, 2020) (quoting *United States v. Nash*, No. 19-cr-40022-01-DDC, 2020 WL 1974305, at *2 (D. Kan. Apr. 24, 2020) (collecting cases)); *see also United States v. Rice*, No. 12-cr-818-PJH, 2020 WL 3402274, at *4 (N.D. Cal. June 19, 2020) (denying a defendant's request for release to home confinement made in conjunction with his motion for compassionate release because "the court has no authority to designate the place of confinement" because the "Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *United States v. Gray*, No. 4:12-cr-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (holding that the CARES Act "does not authorize the court to order defendant's placement in home confinement"). The district court may only impose home detention as a condition of supervised release, rather than as part of a sentence of imprisonment. *See Connell*, 2020 WL 2315858, at *5 n.6, *7. Accordingly, to do as defendant requests, the court would be required to reduce his sentence to one of time served (i.e. approximately 52 months) and modify the conditions of supervised release to require home confinement for approximately 100 months. The court is unwilling to do so for the reasons set forth above. If the BOP determines that the defendant should be released to home confinement to serve his sentence under the Attorney General's expanded authority in that regard (see fn. 2, above) the court trusts it will do so. The issue that this court resolves is merely whether in its view, under the applicable legal standards, defendant's sentence should be reduced.